**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00440 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CORNEALIUS WELLS | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In July 2018, a surveillance team of federal and local law enforcement agents witnessed Defendant Cornealius Wells at a hotel in downtown Chicago interacting with several individuals who had been identified by a confidential informant as involved in the distribution of drugs. Following that interaction, and after one of the other individuals had been separately stopped and found to possess a bag having a narcotic order and containing fifty-thousand dollars in cash, agents stopped the car in which Wells was a passenger. During the stop, agents recovered pills from Wells's pocket after a pat-down search and a duffel bag containing heroin and fentanyl after a search of the vehicle. Wells was then arrested and taken to a police station. He was eventually indicted on one count of possessing with intent to distribute a controlled substance—namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl—in violation of 21 U.S.C. § 841(a)(1). Before the Court are Wells's motions to suppress all evidence recovered as a result of the stop (Dkt. No. 96) and to suppress statements he made during the pat-down search and subsequent post-arrest interrogation. (Dkt. No. 97.) For the reasons stated below, the motions are granted in part and denied in part.

## BACKGROUND

In connection with Wells's motions, the Court held an evidentiary hearing. At the hearing, the Government called three witnesses: (1) Executive Assistant Ibrar Mian, who was the group supervisor of the Drug Enforcement Agency ("DEA") task force conducting surveillance the day of Wells's arrest; (2) Officer William Klomes, who served on the task force; and (3) Special Agent Brett O'Connor, a special agent with the DEA who also served on the task force. Additionally, the Government submitted into evidence various exhibits, including photographs of the vehicle in which Wells was a passenger; photographs of the driver's licenses of Wells and David Gordon, who was driving the car; a photograph of a Whole Foods bag containing United States currency along with a close-up photograph of the currency itself; a photograph of the duffel bag containing heroin found in the car juxtaposed with a bundle of United States currency; and a video recording of the post-arrest interview of Wells at the police station. The evidence adduced at the hearing is summarized as follows.

On July 17, 2018, the DEA was conducting surveillance on Samuel Renteria. Previously, in the fall of 2017, the DEA had received information from a confidential informant that Renteria, along with several other unnamed individuals, were involved in the distribution of narcotics in the Chicago area. A DEA task force was subsequently assigned to surveil Renteria. Wells was not one of the individuals identified by the confidential informant, nor did he match any of the descriptions of those individuals. In fact, Wells was unknown to the task force.

Earlier on July 17, law enforcement agents had observed Renteria leave his residence in a red Cadillac Escalade. He was accompanied by two individuals, Mario Guzman, who had also been with Renteria the day before, and an unidentified woman. After stopping first at a restaurant and then at a gas station, the Escalade parked in front of the AC Hotel in downtown Chicago. A

blue Dodge pulled up behind the Escalade. At some point after the Dodge arrived, Executive Assistant Mian observed Renteria exit the hotel with two other individuals.[1] Those individuals were later identified as Wells and Gordon. (Executive Assistant Mian identified Wells in court as one of the two individuals present that day.) According to Executive Assistant Mian, Gordon and Wells were drinking an unknown substance out of red plastic cups while conversing with Renteria. After spending some time talking and drinking, Renteria and Wells went back into the hotel empty-handed. When they came back out, Renteria had a brown paper bag with a Whole Foods logo on it, which Executive Mian found suspicious, in part because the bag had a rectangular shape at the bottom. Executive Mian never saw Wells hold or look inside the bag.

Renteria then entered the Escalade on the passenger side with the bag while Wells remained outside the hotel. Guzman, who had also exited the Escalade, stood in front of the hotel and appeared to be filming a video or FaceTiming with someone on a phone. After a bit of time, Executive Assistant Mian saw Renteria make a waving motion from the car. Wells and Guzman both approached the vehicle. Guzman went to the front passenger side of the vehicle, while Wells went over to the driver's side and peered through the window. Executive Assistant Mian testified that it looked like Wells was having a conversation with Renteria and Guzman. Following this apparent discussion, Guzman walked away from the Escalade and the hotel, now carrying the brown bag. He then got into a taxicab and left—several members of the team were assigned to follow him while the others stayed behind at the hotel to continue to surveil Renteria and, now, Wells and Gordon.

---

[1] Of the witnesses who testified at trial, only Executive Assistant Mian observed the events at the hotel. Officer Klomes was en route to the hotel while Special Agent O'Connor was parked near the hotel in case Renteria went mobile again—both were informed of what was going on at the hotel and directed over the radio to follow the Dodge.

After Guzman departed, Renteria remained in the Escalade while Wells and Gordon went back into the hotel. They returned carrying luggage—Wells with a dark duffel bag that he placed in the passenger side of the Dodge and Gordon with a dark suitcase that he put in the trunk of the Dodge. The two men then got in the vehicle, with Gordon driving and Wells in the passenger seat. Both the Dodge and the Escalade (containing Renteria) pulled away from the hotel. Rather than immediately stop the vehicles, the surveillance team followed the Dodge and Escalade, which Executive Assistant Mian described as going in tandem north into the city.

While following the Dodge and Escalade, the agents were informed over the radio that Guzman had been stopped as he exited the taxicab and that the Whole Foods bag was found to contain a large sum of money—at the scene, Guzman claimed it was $40,000.[2] Additionally, the agents were told that a narcotics canine had alerted to the presence of narcotics on the cash. At that point, it was determined that the team should conduct a field interview to discuss the events at the hotel. Accordingly, the team surveilling the Dodge, which by then consisted of Executive Assistant Mian, Officer Klomes, Special Agent O'Connor, and another task force officer, Officer Borrow, decided to approach the Dodge.

The four agents and officers walked up to the Dodge, which by this time was legally parked on the street. Executive Assistant Mian and Officer Klomes approached the driver's side of the car, while Special Agent O'Connor approached the passenger side. Executive Assistant Mian testified that they identified themselves as law enforcement. He then asked both Wells and Gordon for their licenses and registration, which the two men provided. According to Executive Assistant Mian, the tone of the encounter was conversational. While a team member went back to run the licenses and check for warrants, the remainder of the team stayed by the Dodge. Along

---

[2] Later, the amount was confirmed to be $50,000.

with what appeared to be a cup of alcohol in the center console, Executive Assistant Mian and Officer Klomes testified that they that they saw a vial with a brown, oily liquid in the car.[3] Both Executive Assistant Mian and Officer Klomes testified that there was a strong smell of marijuana emanating from the vial. Based on their training and experience, as well as the odor, they believed the vial to contain liquid marijuana. According to Executive Assistant Mian and Officer Klomes, Gordon confirmed this suspicion, relaying to the agents that there was alcohol and weed (marijuana) in the vehicle.

Following Gordon's disclosure, Executive Assistant Mian asked Wells and Gordon to step out of the Dodge. Officer Klomes made his way to the passenger side and performed a protective pat-down search of Wells, who had exited the vehicle. According to Officer Klomes, as he was conducting the pat-down search he felt a bulky object in Wells's front pants pocket. Officer Klomes asked Wells what the object was, and Wells replied "skittles." Officer Klomes testified that he understood "skittles" to be a slang term for MDMA or ecstasy. Officer Klomes thus followed up with Wells, asking whether he was referring to ecstasy when he said that he had skittles. According to Officer Klomes, Wells confirmed that the object was indeed ecstasy. Officer Klomes subsequently removed the bag of pills from Wells's pocket.

Once Wells had been patted down, law enforcement searched the Dodge. The duffel bag that Wells had been seen carrying was found at the foot of the passenger seat, where Wells had been sitting. In the duffel bag, law enforcement found a hard, gray-colored substance that was suspected (and later confirmed via laboratory testing) to be heroin. Additionally, money was found in the bag. At that point, Wells was arrested and brought to the Oak Lawn Police Department. Once at the station, Wells was booked into custody. As part of the booking process,

---

[3] Special Agent O'Connor was unable to see into the Dodge from where he was standing.

Wells was asked whether he wanted to claim ownership of the money found in the duffel bag. Wells declined to do so, stating that only the money in his pocket belonged to him.

At the evidentiary hearing, the Government introduced a video recording of Wells being read his *Miranda* rights at 5:17 p.m. on July 17, 2018. As far as any of the witnesses at the evidentiary hearing were aware, this marked the first time that Wells was informed of his *Miranda* rights. In the video, Special Agent O'Connor enters the room along with Officer Klomes and asks Wells, who appears groggy, whether he was taking a nap. Special Agent O'Connor then asks Wells what he goes by, clarifying that he would like to know whether Wells prefers to be referred to as "Cornealius" or another name. Following this exchange, Special Agent O'Connor explains to Wells that he will be providing an overview of what precipitated the stop and arrest, and he specifically instructs Wells that he only has to listen, not respond, at this point. In the middle of the overview, Special Agent O'Connor mentions that a criminal history background check had revealed that Wells had been arrested before. Special Agent then takes a minute to confirm that Wells has "been in this type of environment before, right?" and knows that he needs to be read his rights before being questioned. Then, a little over a minute after entering the room, Special Agent O'Connor reads Wells his *Miranda* rights. Special Agent O'Connor asks Wells whether he understands those rights. Wells nods but does not otherwise respond. When Special Agent O'Connor asks Wells to acknowledge that he knows his rights by signing the printed Advice of Rights Form, Wells refuses, saying he will not sign anything. In response, Special Agent O'Connor once again asks whether Wells understands his rights, even if he will not sign the form. Again, Wells nods his head. Special Agent O'Connor then proceeds with the interrogation.

**DISCUSSION**

Wells asks this Court to suppress all evidence recovered from his interactions with law enforcement on July 17, 2018, as well as any statements he made in connection with those interactions. The Court considers each request in turn.

**I.        Motion to Suppress Evidence**

Wells first asserts that any evidence collected as a result of his interaction with law enforcement was the product of an unreasonable search and seizure and must therefore be suppressed. There are three points at which Wells contends he was illegally seized or searched: (1) when he was initially stopped while a passenger in the parked Dodge, (2) when he was subjected to a protective pat-down search, and (3) when the Dodge was searched.

**A.        Initial Stop**

First, Wells contends that law enforcement unconstitutionally seized him when they stopped him while he and Gordon were parked in the Dodge. The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "Stopping someone is generally considered a seizure and ordinarily requires probable cause to be reasonable." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). The Government does not dispute that Wells was seized from the very beginning of his encounter with law enforcement or that the agents did not have probable cause to arrest Wells when they first approached the Dodge.[4] Nevertheless, the Government argues that this was a lawful stop pursuant to the Supreme Court's decision *Terry v. Ohio*, which recognized an exception to the probable-cause requirement. 392 U.S. 1 (1968). "Under *Terry*, police officers may briefly detain a person for investigatory purposes based on the

---

[4] Specifically, the Government does not dispute that the Dodge was legally parked, the agents did not observe Wells (or Gordon) commit any traffic or criminal offenses, Wells did not attempt to flee, and the agents did not have a warrant to arrest Wells when they first approached the Dodge.

less exacting standard of reasonable suspicion that criminal activity is afoot." *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020). Although not an arrest, a *Terry* stop is still a seizure and may in fact be "highly intrusive." *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018).

While a *Terry* stop may be effectuated without probable cause, the officer conducting the stop must be "able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (internal quotation marks omitted). "[R]easonable suspicion is an objective standard, considering the totality of the circumstances." *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019). Put another way, to determine the "requisite level of reasonable suspicion for a *Terry* stop, [courts] do not consider in isolation each variable of the equation" but "[i]nstead consider the sum of all of the information known to officers at the time of the stop." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal quotation marks omitted). That information "includes behavior that may in other circumstances be considered innocent; in other words, context matters." *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014). When faced with a motion to suppress, "the government bears the burden of establishing reasonable suspicion by a preponderance of the evidence." *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

As a preliminary matter, the Court confirms that the initial encounter between Wells and the agents was indeed a *Terry* stop. The Government does not dispute that Wells was "seized" within the meaning of the Fourth Amendment—that is, a reasonable person in his position would not have believed he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Indeed, the agents testified at the evidentiary hearing that Wells was not free to leave once they approached the car. While Wells goes further and suggests that he was subjected to a "custodial seizure" akin to an arrest from the moment he was stopped, the Court disagrees. Wells was

detained briefly while the agents first asked for identification and then as the officers conducted the pat down and search of the car. Aside from the fact that the officers were armed (although their guns were not drawn), Wells points to no other indicia suggesting that the initial stop was anything more than investigatory. *See Bullock*, 632 F.3d at 1015 (describing how a *Terry* stop "can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive"). Thus, the Court finds that Wells was originally subjected to a *Terry* stop, which, once the agents discovered suspected narcotics, eventually matured into an arrest.

The determinative issue with respect to the initial encounter between the agents and Wells is therefore whether, based on the totality of the circumstances, the agents had reasonable suspicion that Wells was engaged in criminal activity to justify the stop. The Court concludes that they did. As each witness testified, the agents decided to stop Wells because they suspected that he had been involved in a drug transaction with Renteria in front of the hotel and they wished to investigate that interaction further. The agents had numerous specific and articulable facts to support their suspicion that Wells had been involved in a drug transaction. A surveillance team had witnessed Wells engage in a series of interactions with Renteria, the target of a narcotics investigation, which suggested that some sort of transaction had occurred. Specifically, the team saw Wells and Renteria enter the hotel together empty-handed, only to exit with Renteria now carrying a Whole Foods bag. Wells then seemed to engage in a conversation with Renteria and Guzman at Renteria's car, after which Renteria transferred the Whole Foods bag to Guzman, who left the hotel. Following this exchange, Wells re-entered the hotel with Gordon, again empty-handed, and once more exited carrying previously unseen bags (the duffel bag and suitcase). For

the agents watching the hotel, these actions raised suspicions of a narcotics transaction, which they relayed over the radio to other members of the team.

In disputing the existence of reasonable suspicion, Wells highlights that each individual action, on its own, could be viewed innocently by a bystander. However, the Court must consider the totality of the circumstances known to the agents at the time. *United States v. Riley*, 493 F.3d 803, 809 (7th Cir. 2007) ("Although . . . all of these [circumstances] taken separately might not justify a stop, we do not evaluate the circumstances in isolation. Furthermore, these circumstances must be viewed through the lens of . . . an experienced officer."); *see also United States v. Askew*, 403 F.3d 496, 508 (explaining that patterns of behavior that may seem innocent to an untrained observer may justify an investigatory stop when viewed in light of the experience of drug enforcement agents and finding that an individual was properly subject to a *Terry* where he was circling a lot where a trusted informant indicated a drug transaction was to occur, even where the car did not match that given by the informant). And here, experienced agents witnessing Wells's actions at the hotel drew the conclusion that a drug transaction might have occurred. Viewing the evidence as a whole, the Court finds no reason to question this suspicion. Wells engaged in several conversations with Renteria, the target of an active narcotics investigation, and he (or those with whom he was associating) entered a hotel empty-handed and returned carrying a bag several times. Additionally, one of those bags (the Whole Foods bag) was transferred to yet another individual following a discussion with Renteria. While it is true that individuals often carry luggage out of hotels, the combination of repeated trips, the transfer of the bags, and a clear association with an individual suspected of narcotics trafficking all support the officers' reasonable suspicion that Wells was involved in some sort of drug transaction.[5]

---

[5] Wells also makes much of the fact that he himself was not the target of the investigation. In so doing, he appears to suggest that an individual must be identified as the subject of an investigation before police

Moreover, while the pattern of activity at the hotel could possibly, on its own, have generated reasonable suspicion for the stop, the agents did not rely solely on those observations in deciding to approach the Dodge. According to the testimony at the evidentiary hearing, the decision to stop Wells was made only after other team members relayed that they had stopped Guzman and discovered that the Whole Foods bag contained tens of thousands of dollars in cash.[6] Additionally, a canine unit on the scene alerted the officers to the presence of narcotics on the money in the bag. Given that Wells had exited the hotel with Renteria, who was carrying the Whole Foods bag, then apparently conversed with Renteria and Guzman before Guzman took possession of the Whole Foods bag and left, this information only served to heighten suspicions that Wells had indeed been involved in a narcotics transaction. While Wells himself never held the Whole Foods bag, he nonetheless was seen closely interacting with those who did and seemingly participated in a conversation that resulted in the transfer of the Whole Foods bag from Renteria to Guzman.

In sum, the combination of the surveillance team's observations of Wells's actions at the hotel and the information about the contents of the Whole Foods bag carried by Guzman firmly established the reasonable suspicion necessary to conduct a *Terry* stop. Accordingly, the Court will not suppress any evidence on the basis that the stop was unlawful.

---

may effectuate a stop. But a defendant's own behavior, without any corroboration by a confidential source or prior identification, may provide the basis for a lawful *Terry* stop. *See, e.g., Ruiz*, 785 F.3d at 1141–43 (finding that officers had reasonable suspicion to carry out a *Terry* stop where they witnessed the defendant meet with a suspected drug dealer and take actions consistent with hiding drugs in vehicles, even though the officers did not witness any drugs change hands).

[6] At times, Wells suggests that any evidence seized from him must be suppressed as the fruit of the poisonous tree of the unconstitutional search and seizure of Guzman. However, "Fourth Amendment rights are personal and cannot be asserted vicariously." *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996) (citing *United States v. Payner*, 447 U.S. 727, 731 (1980)). Guzman's detention and search, lawful or not, did not implicate Well's own personal Fourth Amendment rights—accordingly, Wells has no standing to challenge either Guzman's stop or any resulting evidence recovered.

### B.     Pat Down

Next, Wells argues that the officers conducted an illegal pat down and seeks the suppression of any evidence discovered as a result. Beyond authorizing the initial investigatory stop, "*Terry* permits the officer conducting such a stop to conduct a limited search of the suspect to determine whether he is armed, when the circumstances give rise to a reasonable belief that the individual may have a weapon and thus pose a danger to the officer or others in the immediate vicinity." *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013). The lawfulness of a frisk is reviewed separately and under a slightly different standard from the initial stop. *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013). Put simply, "an officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'" *Id*. "Such suspicion must be specific to the person being searched and may not arise from mere proximity to criminal conduct." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979)).

The Government primarily argues that the pat down was justified because the officers reasonably suspected that Wells was involved in an expensive drug transaction and because individuals involved in such transactions are often armed. To be sure, the "violent nature of the drug trade" may "supplement an otherwise suspicious situation [to] give rise to a reasonable concerns [sic] about safety." *United States v. Kenerson*, 585 F.3d 389, 392 (7th Cir. 2009). But again, the analysis as to the legality of a frisk is individualized—the mere fact that an individual might be associated with drugs or present in a high-crime area is not enough, without more, to justify a pat down. *See, e.g.*, *Maryland v. Buie*, 494 U.S. 325, 334 at n.2 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires

reasonable, individualized suspicion before a frisk for weapons can be conducted."); *Ybarra*, 444 U.S. at 94 (explaining that the "narrow scope of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed ***at the person to be*** frisked, even though  that person happens to be on premises where an authorized narcotics search is taking place" (emphasis added)).

Although courts often cite the violent nature of the drug trade in finding that a frisk was justified, they also rely on facts separate from the defendant's suspected involvement in the drug trade to reach that finding. *See, e.g.*, *Kenerson*, 585 F.3d at 392–93 (finding that an officer had reasonable suspicion to suspect the defendant was a drug dealer who may be armed and dangerous where the officer witnessed the defendant enter a car after what appeared to be a covert exchange, there was a tip that drug deals were to take place at the location where the defendant was picked up, the driver of the vehicle gave a story as to the defendant's presence in the car that conflicted with the officer's observations, and the defendant had made a "furtive movement with his shoulders" upon being pulled over); *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (noting that reasonable suspicion that the defendant was engaging in drug-related activity justified a *Terry* stop and that this suspicion, coupled with the fact that the patrolling officer had recovered drugs and firearms from the defendant in prior arrests, justified a frisk). For instance, in *United States v. Brown*, the defendant challenged a pat down on the basis that, although he admitted that at the time of the stop he was in a car that was under FBI surveillance for large-scale operations and the car strongly smelled of marijuana, the officer who conducted the frisk was unaware of who was the specific target of the surveillance or who was responsible for the marijuana smoke (there were several individuals in the car). 188 F.3d 860, 865 (7th Cir. 1999). Nonetheless, the Seventh Circuit affirmed the denial of the defendant's suppression motion, noting that that the

totality of the circumstances surrounding the pat down included not just the indications that the defendant was involved with drugs, but also his nervous demeanor, repeated glances back at the car, and presence in a neighborhood known for drug activity and gang violence. *Id.* In other words, while the fact that the officer reasonably suspected the defendant was involved in drug dealing weighed into the court's analysis, it was not the ***only*** factor supporting reasonable suspicion.

Here, however, the connection between the drug trade and weapons is the only basis offered for the agents' belief that Wells posed a danger to those around him. There was no testimony at the evidentiary hearing as to Wells's demeanor that would suggest he had something to hide—by all accounts, he was cooperative with the agents, he did not appear nervous, and he made no furtive or sudden movements that might suggest he was trying to hide a weapon. Additionally, there is no testimony that the officers saw anything, such as a visible bulge, to indicate that Wells was armed. And, unlike in other cases where the officers had knowledge that the specific defendant had previously carried a firearm, Wells was unknown to the agents at the time of the frisk. The record also fails to reveal any reason to suspect that associates of Renteria were armed. It is worth noting that while the Government emphasizes that individuals involved in high-value drug deals are often armed, agents searching Guzman (who was carrying tens of thousands in cash) did not recover a weapon or, at the very least, such information was not conveyed to the agents trailing Wells. In other words, while individuals conducting drug deals worth substantial sums of money often carry weapons, there was no evidence here to suggest that those involved in ***this*** particular transaction were armed.

Instead, the frisk of Wells appears to be the type of "rote or reflexive" frisk explicitly barred under *Terry*.[7] *United States v. Howell*, 958 F.3d 589, 601 (7th Cir. 2020). This is not to say that the agents conducted the pat down arbitrarily—after all, the agents suspected that Wells was involved in a narcotics transaction of considerable value, and they knew that the car likely contained marijuana (apparently for personal use). But the Court is hesitant to find, as the Government essentially argues, that an officer may automatically conduct a frisk so long as there is reasonable suspicion that a defendant has participated in a drug transaction worth a non-negligible sum. While the Court recognizes the importance of officer safety and the danger officers encounter every day on the job, it must also recognize that illegitimate frisks "constitute severe intrusions upon individual liberty" against which individuals must be protected. *Williams*, 731 F.3d at 686. Thus, because the agents can point to no facts specific to Wells and not just the drug trade in general that might have resulted in the reasonable belief that he was armed and dangerous, the Court finds that the pat down was unlawful and any evidence recovered as a result must be suppressed. Therefore, the Court finds that the pills recovered from Well's pocket, as well as any statements confirming that those pills were drugs, will be suppressed.[8]

## C.    Search of the Car

Finally, Wells contends that any evidence recovered from the Dodge must be suppressed as the result of an unconstitutional search. Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated

---

[7] In fact, at the evidentiary hearing Special Agent O'Connor suggested that he would conduct a pat down as a matter of course when stopping an individual.

[8] The Government did not raise any alternative means by which the results of the pat down could be entered into evidence (such as the inevitable discovery doctrine). Accordingly, the Court considers those arguments waived and declines to consider whether any such exceptions apply.

exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The "automobile exception" is one such exception. *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026 (7th Cir. 2022). Under the automobile exception, an officer may constitutionally conduct a warrantless search of a vehicle "so long as there is probable cause to believe [a vehicle] contains contraband or evidence of illegal activity." *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (collecting cases).

In this case, the agents undoubtedly had probable cause to search the car.[9] Both Executive Assistant Mian and Officer Klomes credibly testified that they clearly saw a vial of oily brown substance which, based on their training and experience, appeared to be liquid marijuana. Not only did both see the vial of liquid marijuana, but they also both stated that they detected the odor of marijuana coming from the container. The "smell [of marijuana] alone [is] enough to give rise to probable cause to search the entire vehicle." *United States v. Mosby*, 5412 F.3d 764, 768–69 (7th Cir. 2008) (collecting cases); *see also United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020) (noting that the smell of burnt marijuana provided probable cause to search the car's passenger compartment).[10] Yet here, the agents had more than just the smell and visual appearance of marijuana upon which to base the search of the vehicle—both Executive Assistant Mian and Officer Klomes testified that Gordon informed them that there was alcohol and marijuana in the car. Considering these facts, the Court finds that probable cause existed to search

---

[9] Because the Court has found that the pat down of Wells was unlawful, it will not consider either the pills recovered from that search or Wells's statements regarding the pills in this analysis.

[10] The Court acknowledges that the recreational consumption, possession, and sale of modest amounts of cannabis (marijuana) has been legal in Illinois since January 1, 2020. 410 ILCS 705/10-5. However, because Wells was stopped in 2018, the Court need not address the impact of legalization on the probable cause analysis. Moreover, even under current Illinois law, it is illegal to possess cannabis in a vehicle unless the substance is in a "secured, sealed or resealable, odor-proof, child-resistant cannabis container that is inaccessible." 625 ILCS 5/11-502.15.

the car. Accordingly, Wells's motion to suppress any evidence found during the resulting search is denied.

## II.    Motion to Suppress Statements

Wells separately seeks to suppress any statements he made during his encounter with law enforcement on the basis that he was subject to a custodial interrogation without being informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Under *Miranda*, "a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination." *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007). Consequently, an individual "must be both 'in custody' and 'subjected to interrogation'" for *Miranda* warnings to be required. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (internal quotation marks omitted). Here, there are three distinct sets of statements that Wells seeks to suppress on the basis that they were elicited in violation of *Miranda*: (1) statements made during the pat down, (2) statements made concerning ownership of the money found in the Dodge while he was being booked into custody, and (3) statements made during his post-arrest interview at the station.

### A.    Statements Made During the Pat Down

Wells first contends that any statements—specifically, any mention of "skittles" or "ecstasy"—made in response to questions asked by Officer Klomes during the pat down were elicited in violation of *Miranda*. Because the Court has already determined that the pat down was unconstitutional, it need not address whether Wells was both in custody and interrogated while being frisked by Officer Klomes. For this reason, and not in reliance upon *Miranda*, the Court grants Wells's motion to suppress statements made during the unlawful frisk.

### B.  Statements Made During Booking

Wells next argues that any statements he made while being booked regarding the ownership of the money found in the Dodge must be suppressed. In response, the Government contends that any questions about whether Wells would like to claim items found in the car—such as bags or money—are standard booking questions falling outside the scope of *Miranda's* protections. *See United States v. Hernandez*, 751 F.3d 538, 541 (7th Cir. 2014) ("Officers do not violate *Miranda* by asking a 'routine booking question'" (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990))). Under the routine booking exception, "a *Miranda* violation does not occur when officers question a defendant only to a limited extent for personal data required as part of the processing normally attendant to arrest and custody since these types of questions would not reasonably be expected to elicit incriminating responses." *United States v. Lee*, 618 F.3d 667, 677–78 (7th Cir. 2010). This exception has been applied to cover questions as to a defendant's identity and residence, *United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011), and the Seventh Circuit has indicated (though not decided) that even questions that could elicit potentially incriminatory information, such as those about a defendant's drug associates, may be permissible. *Lee*, 618 F.3d at 678 (noting that agents may routinely obtain information about gang affiliations to ensure prisoner safety).

The Court is unpersuaded that questions about the ownership of potentially incriminating items (here, money suspected to be drug proceeds) fall under the routine booking exception. That a question was asked during the booking process does not automatically qualify it for the exception. *See Muniz*, 496 U.S. at 602 n.14 (clarifying that the mere fact that a question is asked during the booking process does not necessarily mean it will fall under the exception). Instead, the Court must ask whether the questions are meant to "secure the biographical data necessary to

complete booking or pretrial services" and are "reasonably related to the police's administrative concerns." *Id.* at 601–02. In this case, the Government insists that questions regarding whether the money belonged to Wells were necessary to inventory evidence properly, making those questions administrative rather than interrogatory. Yet the Court does not see why knowing the ownership of a specific item is necessary to catalogue it—after all, officers regularly record evidence where the owner's identity is unknown or uncertain. To the contrary, asking an individual in custody to confirm or deny whether an incriminating item belongs to them is exactly the type of interrogation covered by *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (explaining that *Miranda* applies to express questioning, or its functional equivalent, that the police "should know [is] reasonably likely to elicit an incriminating response from the suspect"). Accordingly, the Court grants Wells's motion to suppress with regards to any statements he made regarding the ownership of items found in the Dodge and before he was given his *Miranda* warning.

### C.   Statements Made During the Post-Arrest Interview

Finally, Wells asserts that he never voluntarily waived his *Miranda* rights after receiving the *Miranda* warning and thus any statements made during his interrogation must be suppressed.[11] A defendant's waiver of his Miranda rights can be either express or implied by all the circumstances. *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010). The Government bears the burden of establishing waiver. *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009).

Wells argues that his refusal to sign the advice of rights waiver form demonstrates that he did not make a knowing and voluntary waiver of his rights. However, "waiver may be inferred

---

[11] In seeking to suppress all statements, Wells necessarily argues that any questions asked by Special Agent O'Connor right before he read the *Miranda* warning were asked in violation of *Miranda*. Those questions, which consisted of asking Wells if he had just woken up and confirming that Wells had been arrested before, were clearly rhetorical questions intended to establish a conversational rapport and put Wells at ease.

from the defendant's conduct, even when [he] has refused to sign a waiver form." *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000); *see also United States v. Thurman*, 889 F.3d 356, 365 (7th Cir. 2018) ("Refusal to sign a waiver form, however, is not enough to defeat credible evidence of an implied waiver."). Although Wells did not sign the formal acknowledgement of his rights, other evidence indicates that he voluntarily waived his rights. Special Agent O'Connor twice asked Wells whether he understood his rights—both times, Wells nodded affirmatively. Indeed, the circumstances of Wells's interrogation closely resemble those of other cases in which courts have found a voluntary waiver of rights: Special Agent O'Connor behaved professionally, the tone of the interrogation was conversational and informal, and Wells was not otherwise incapacitated.[12] *See Id.* at 365 (describing how courts regularly affirm the voluntariness of defendants' waivers where the interrogation is informal and there are no other signs of coercion). Moreover, Wells's refusal to sign the waiver, or anything else, itself "shows [his] independent thinking and exercise of free will." *Smith*, 218 F.3d at 782 (explaining how a refusal to sign a waiver of one's Miranda rights may in fact bolster the conclusion that any later statements were made voluntarily).

Put simply, Wells was properly informed of his *Miranda* rights, he gave nonverbal acknowledgement that he understood those rights, there is no indication (nor does Wells argue) that he was subject to any coercion, threats, or otherwise incapacitated, and his own actions confirm that he was capable of making an informed decision. Accordingly, Wells's motion to suppress any statements made at the station and after he was given his *Miranda* warning is denied.

---

[12] Wells notes that he had obviously just woken up when the interrogation began, but he was responsive and alert by the time Special Agent O'Connor began questioning him. Being tired, however, is not the same as being incapacitated from sleep deprivation, and Wells points to no other reason to suspect he was unable to make an informed decision to waive his rights.

## CONCLUSION

For the reasons given above, Wells's motion to suppress evidence (Dkt. No. 96) is granted with respects to the pills recovered during the pat down and denied as to all other evidence. Similarly, Wells's motion to suppress statements (Dkt. No. 97) is granted with respect to any statements made during the pat down and concerning the ownership of items in the car but denied as to any statements made during his post-arrest interview at the station.

ENTERED:

Dated:  June 1, 2023

_____
Andrea R. Wood
United States District Judge